THE AMERICAN CENTRAL INSURANCE COMPANY et al.

*v.*

GERHARDT W. I. LANDAU.

[Filed October 17th, 1898.]

1. Thirty-two insurers under twelve separate policies filed a bill to enjoin separate suits against them, and alleged that some of their policies covered insured's property in one of three buildings, and some in another, and some in all the buildings; that each policy contained a provision that the insurer should not be held liable for a greater proportion of any loss than the amount insured therein should bear to the whole insurance; that insurers had jointly tendered the aggregate amount of an award that had been made under insured's agreement with them jointly to arbitrate according to the provisions of each policy.—*Held* sufficient on demurrer for want of equity.

2. Such bill is not subject to demurrer as multifarious.

On demurrer to bill.

*Mr. Edward M. Colie,* for the complainants.

*Mr. Eugene Stevenson,* for the demurrant.

PITNEY, V. C.

The bill is filed by nine corporations and twenty-three natural persons to enjoin nine suits already commenced against the corporation, and twenty-three others threatened against the indi-

vidual natural persons, based on policies of insurance under-
written by the complainants to the defendant upon a silk plant
consisting of machinery, &c., in the city of Paterson. The
twenty-three natural persons underwrote a single policy under
the name of The Traders' Fire Lloyds of New York City.

The ground of demurrer is want of general equity and multi-
fariousness, and that the complainants have an adequate remedy
by way of defence at law.

Briefly stated, the bill sets out that the nine corporations com-
plainant, and the twenty-three natural persons (constituting The
Traders' Fire Lloyds of New York City), insured the property
in question, and that there were also two other policies under-
written upon it, one by a corporation known as The Buffalo
Insurance Company, and another by an association of under-
writers known as The Manufacturers' Lloyds, consisting of
twenty-five natural persons; making twelve policies in all.
That all the policies did not cover all the property; that it
was contained in three different buildings, and some of the
policies covered the property in one building, and some that in
another, and some covered property in all the buildings. But,
as I read the schedules, it is not quite certain that any one cov-
ered all the property.

That each policy contained the following provision:

"That the underwriters or insurers shall not be liable under the policy for
a greater proportion of any loss on the described property, or for loss by or
expense of removal from premises endangered by fire, than the amount hereby
insured shall bear to the whole insurance, whether valid or not, or by solvent
or insolvent insurers, covering such property."

And also the following clause:

"That in the event of disagreement as to the amount of loss, the same shall
be ascertained by two competent and disinterested appraisers, the insured and
the insurer each selecting one, and the two so chosen shall first select a compe-
tent and disinterested umpire; that the appraisers together shall then estimate
and appraise the loss, stating separately sound value and damage, and, failing
to agree, shall submit their differences to the umpire, and the award in writ-
ing of any two shall determine the amount of such loss."

The bill further sets out an injury to the property by fire in May, 1895; that the complainants and the other underwriters, being unable to agree with the defendant as to the extent of the loss, entered into a joint or consolidated written agreement for appraisal, in accordance with the terms of the arbitration clause just cited. This document is set out in full as a schedule to the bill, of which, by proper averment, it is made a part. It consists, first, of several sheets, each giving a separate description of the property found in one or more of the original policies. Then comes the agreement itself, which also contains a general description of the property and its location. The terms of the agreement will be mentioned presently. Annexed to the agreement is the oath of the appraisers and umpire, and then a detailed list of each piece or kind of property, with the number of each. This consists of eight sheets of lists of property contained in seven rooms. Opposite each article is put down a sum of money as a sound price, and then opposite this again is the amount of damage, making two columns, one of sound price and one of damage. The total sound value is $14,205.01, and the total damage is $5,936.90.

The document itself provides that the defendant, of the first part, and the Palatine Insurance Company, one of the complainants, and the several other insurance companies interested, of the second part, do agree

"that Frank Atherton and Edward S. Winchester, they first selecting a competent and disinterested umpire, to whom they shall submit their differences in case of failure to agree, shall estimate and appraise the loss and damage by fire of May 7th, 1895, to the property of G. W. I. Landau, as mentioned herein or specified in schedule annexed, stating separately sound value and damage, which estimate and appraisal by them or two of them, in writing hereon, shall determine the amount of such loss and damage, it being understood that this agreement is of binding effect only as regards the sound value and damage of the said property, and does not in any respect waive any of the conditions of the insurance policy."

Then follow a schedule and general description of the property, and then follows this:

"It is expressly understood and agreed that the said appraisers are to consider the age, condition and location of said property previous to said fire, and shall make a proper deduction for depreciation and difference between the value of like property replaced new and the property mentioned.

"Dated New York, this 19th day of September, 1895."

It is signed by the complainants severally, either in person or by agent, and also by the Buffalo Insurance Company, but not by the Manufacturers' Lloyds.

The award is signed by two—by Edward S. Winchester as appraiser, and Charles H. Manning as umpire, who joined in taking the oath—and estimates the damage at $5,936.90.

The bill proceeds to state that this award was accepted by the complainants and that they immediately offered to pay the sum awarded to Mr. Landau, but that he refused to accept it and waived a formal tender of the amount, and then commenced the suits above mentioned.

Upon the case made by the bill the award and payment or tender under it seem to be a perfect bar to the defendant's actions at law. The agreement is one substantially in accordance with the terms of the provision for that purpose found in the several policies. It was entered into voluntarily by the defendant. The appraisers seem to have acted strictly in accordance with the terms of the submission. They chose an umpire and all were sworn. Then the two original arbitrators were unable to agree and they called the umpire in, and they appear to have placed a sound value upon each item and fixed the loss and injury by the fire on each item.

The complainants' case is that the award is valid and binding on the defendant, and it must be treated as such for present purposes. In short, it must be treated as a final determination suffered by the several parties of the extent of the entire loss by the defendant, and a payment or tender of the amount by the complainants to the defendant must be held to be a bar to an action at law against them directly and severally on their several policies.

It is to be observed that no question can be raised here as to the validity of the clause providing for this mode of ascertain-

American Central Ins. Co. v. Landau.

ment of the question of the *quantum* of loss. Such question can only be raised when one or the other of the parties has refused to join in a proceeding under that clause. But if the clause were subjected to that test its validity seems well established by authority. *Wolff* v. *Insurance Company, 21 Vr. 453.* But here the parties have voluntarily submitted the question to arbitration, and the award on its face is quite valid and binding without the aid of the contractual clause found in the policy. The only value of that clause is to show that the proceeding was an ordinary and proper one, and to explain the verbiage of the award.

The first question is whether it constitutes such a defence as can be readily availed of by the several complainants as a defence in a court of law to the several actions brought against them. It seems to me that each complainant, in order to avail himself of such defence, must either pay the whole sum awarded into court or, at his peril, take the risk of ascertaining in advance the precise sum which is his share of the whole to pay under the terms of the several policies, and pay that sum into court. If he fails to pay into court the precise amount which a jury may find to be his share, he will be subjected to costs upon a recovery of that precise amount. And this state of facts applies to each of the thirty-three suits already brought or threatened to be brought.

It was suggested by the counsel for the demurrant that one payment into court would be sufficient; that the person first sued should pay the whole amount of the award into court, and then that such payment will inure to the benefit of all the others, and that the court of law will not require more than one payment. The bill states that the suits were all brought in one court, to wit, the circuit court of the county of Passaic. Hence it is perhaps to be presumed that the circuit court might make such an order. But the question is whether it is obliged to do it or not, *ex debito justitiæ,* and I am not sure that it is.

Again, in this connection, another question arises. The tender of the whole loss was made by the complainants combined. Can, then, each of the complainants avail itself or himself of such a

tender to support a plea at law of tender of a smaller amount, being the share properly due from him?

No doubt these complainants (although it is not so alleged in the bill) have arranged among themselves as to how this payment shall be divided among them under the very peculiar state of facts here existing. And they may have done this, in order to avoid expense, arbitrarily, and not on principle. Or it may be that they are not agreed upon such division, but are content to make up a pool to pay the amount, and then quarrel among themselves hereafter as to the proper adjustment of contribution. It is well known that there is a class of gentlemen who are known as insurance adjusters, who make it their business to adjust just such matters. But they may agree, or they may disagree, and the result would be a litigation in which the defendant has no interest whatever, and should be content if he gets the precise amount which is due him.

Now, it seems to me that the only safe way for the several complainants to avail themselves of their several defences to the several actions will be by settling in advance among themselves the precise amount that shall be paid by each, and by each paying that amount into court in the particular suit against each. Having done that, however, they will be met with the right of the plaintiff in the action at law to contend that such partition or adjustment so made between the companies is not the true one, and submit it over again in each particular case to the jury in that case. And here opens before us the real difficulty on this part of the case. If the plaintiff is to have thirty-three actions against the thirty-three parties, or, consolidating the Traders' Lloyds, if he is to have ten different actions against ten different parties, before ten different juries, the finding of the jury in one case will not, in the absence of stipulation, bind the parties or the jury in another case; and the sum total of the ten verdicts, though made upon the basis of the validity of the award and the total amount of damage, may vary from the actual amount.

In answer to this view it is urged that the proportion which each of the underwriters should bear is fixed by the terms of the

policy, so that it is only necessary to do a simple sum in arithmetic to ascertain the amount chargeable against each. This would be so if each policy covered precisely the same property, but such is not the case. Some of the policies do not cover all the property, and those that do not cover all the property do not, in themselves, cover the same property; but there is what may be called a double or triple overlapping, and to ascertain the share of each one will require the ascertainment of the amount of other insurance upon the particular property covered by the particular policy, and then the proportions will, after all, have to be adjusted by taking into consideration the amount and value of property not covered by the particular policy included in other policies covering that property. This view presents a very complicated state of things, which, as I said, forms a problem for an experienced insurance adjuster and is one very difficult for a jury to deal with.

I am satisfied, from an examination of the schedules of property covered by each policy, that it will be very difficult for the complainants to maintain their several defences at law, and that they ought not to be subjected to the expense and risk of that attempt.

The further question also arises at once, *cui bono?*—of what use are these several suits at law brought to recover a fixed sum of money which the parties owing are willing to pay at once? Is it equitable for the defendant to bring so many suits?

The case would be different if the complainants had not waived, as between themselves and the defendant, the settlement of the relative liabilities between themselves, and agreed in some way in making up the money to pay the defendant at once.

Of course it is supposable that the object of the defendant in bringing these actions at law is to ask the court to hold that the award is not valid or binding upon him, and is, for some reason or other, void; but that mere supposition cannot be taken into account in this connection on demurrer, where, as I have said, we must proceed upon the basis that the award is binding and fixed absolutely, as between the parties, the damages

to the property covered by the policies, and, as a result, fixes absolutely the measure of damages against the complainants, in favor of the defendant.

It is impossible, at this stage of the cause, to anticipate that the defendant may, by his answer and proofs, show some good reason why he should be permitted to go into a court of law and, before a jury, to contest this award. When he can show a good reason for such course this court will, as a matter of course, permit him to pursue it, under such restrictions as will protect the complainants from unnecessary cost and litigation. In the present state of the cause, however, it seems highly inequitable for the defendant to resort to his strict legal right to bring thirty-three suits at law to collect a sum of money which is not in dispute and which has been tendered to him, and to compel thirty-three defendants to incur the risk and expense of making distinct defences, which, even if successful on the general question, may still be so far unsuccessful in the matter of tender and payment into court as to subject them to liability to pay costs. Besides, in these days, the mere matter of taxable costs does not indemnify for the labor and expense of conducting a lawsuit. For all these reasons it seems to me that the course taken by the defendant is inequitable and oppressive.

It is said, in answer to this, that it is no more so than what occurs every day in actions on policies of insurance. But it is a well-known fact that it is quite usual, where there are several policies of insurance upon a piece of property which is destroyed or injured by fire, and a dispute arises either upon the general question of liability or upon the extent of the loss, for the parties to agree among themselves that one action shall be brought to trial, and the liability and its extent on the other policies shall stand or fall by that one action. In point of experience, so far as I know, the pressing of so many actions at once is not common. Such practical consolidation was, I believe, the common practice in England under the old Lloyd policies. It does not appear in this case whether any attempt has been made to save litigation in this respect by making any offer of an arrangement of that sort, and the maxim must apply that " What does

not appear, does not exist." It may be that the defendant by his answer will show, as I have said, that he only proposes to bring one action to trial in order to test the validity of the award, based upon some ground which does not appear in the complainant's bill.

There is still another reason that strikes me as having some force, and which intensifies the inequitable position of the defendant, or rather eliminates the objection for multifariousness which was urged by him, and that is, that there has been in this case a *quasi* voluntary consolidation of the causes of action by the entering into the joint arbitration agreement with all the complainants. This was undoubtedly done to save the trouble and expense of ten or eleven different arbitrations, and also the extreme difficulty and expense of ascertaining the precise amount for which each one was liable.

Upon the whole case I think the bill discloses equity, and that the demurrer must be overruled.

This result seems to be sustained by authority. The right of several individuals interested in a single question to combine in an action in equity to establish their right, in order to save multiplicity of actions, is recognized by the text-writers. In *Kerr on Injunctions 135* the learned author uses this language:

"In cases where there is one general common right to be established against several or a number of distinct persons, whether one person claims or defends a right against many, or many claim or defend a right against one, a court of equity will interpose, in order to prevent multiplicity of suits, and instead of suffering parties to be harassed by a number of separate suits, each of which only decides the particular right in question between the plaintiff and the defendant to it, it will at once determine the right by a decree, having previously, if necessary, directed an issue for its information. It is no objection to the bill that the plaintiffs may each claim a right against one defendant, or several defendants may each have a right to make a separate defence against the claim of one plaintiff, provided there be only one general question to be settled which pervades the whole. It is enough that there is one general question as between the one plaintiff and the several defendants, or the one defendant and the several plaintiffs."

And in *Adams on Equity 199*, the doctrine is thus stated: .

" Bills of peace of the first class are those where the same right is claimed
by or against a numerous body; as, for example, where a parson claims tithes
against his parishioners or the parishioners allege a *modus* against the parson;
where the lord of a manor claims a right against the tenants or the tenants
claim a common right against the lord; or where the owner of an ancient
mill claims service to his mill from all the tenants of a particular district.
In all these cases the only form of procedure at common law would be that of
a separate action by or against each parishioner or tenant, which would only
be binding as between the immediate parties and would leave the general
right still open to litigation. In order to remedy this evil a suit may be sus-
tained by the court of chancery, in which all parties may be joined either in-
dividually or as represented by an adequate number. If any question of
right be really in dispute it will be referred to the decision of a court of law,
and when the general right has been fairly ascertained an injunction will be
granted against further litigation. If particular individuals have special
grounds of claim those claims will be left untouched."

And Professor Pomeroy, in his treatise on *Equity* § *244 et
seq.*, in dealing with the jurisdiction of the court to prevent
multiplicity of suits, enumerates four classes of cases, the third
of which he states thus:

" Where a number of persons have separate and individual claims and
rights of action against the same party, A, but all arise from some common
cause, are governed by the same legal rule and involve similar facts, and the
whole matter might be settled in a single suit brought by all these persons
uniting as co-plaintiffs, or one of the persons suing on behalf of the others or
even by one person suing for himself alone. The case of several owners of
distinct parcels of land, upon which the same illegal assessment or tax has
been laid, is an example of this class."

And he shows by an elaborate examination of authorities
(§§ *264–269*) that the jurisdiction of the court in such case has
frequently been invoked and exercised and is well established.

Among the numerous decided cases, I refer to the following:
*Roe et al.* v. *Bishop of Exeter, Bunb. 57,* a bill to establish a
*modus. Powell et al.* v. *Earl of Powis, 1 Younge & J. 159,* a
bill by numerous freehold tenants of a lordship, having rights
of common for their cattle, and of turbary and estovers, to estab-
lish their right, and to enjoin numerous actions of trespass
brought against them individually. *Kensington et al.* v. *White
et al., 3 Price 164,* a bill by numerous individual underwriters,

upon the same risks against the insured, for special relief. *Mills* v. *Campbell*, *2 Younge & Coll. Exch. 389*, a similar bill. *Irving et al.* v. *Viana*, *McClel. & Y. 563*, a similar bill. *Falls of Neuse Manufacturing Co.* v. *Georgia Home Insurance Co. et al.; 26 Fed. Rep. 1*, before two federal judges. In that case several actions at law had been brought by the plaintiff against several insurance companies in the federal court, and the insurance companies moved to consolidate the suits and transfer them to the equity docket, and to allow the defendants to set up in equity a defence common to all, and it was so ordered. *Osborne et al.* v. *Wisconsin Central Railroad Co.*, *43 Fed. Rep. 824*, before Mr. Justice Harlan (*Sup. Ct. U. S.*) and Circuit Judge Bunn, a suit by divers landowners, owning severally different tracts of land, all depending upon the same title, against the railroad company, which had appropriated by one proceeding the lands of each. *Lovett* v. *Prentice*, *44 Fed. Rep. 459*, substantially the same case as the last. In the same direction are *Fuller* v. *Detroit Fire and Marine Insurance Co.*, *36 Fed. Rep. 469; Pennefeather* v. *Baltimore Steam Packet Co.*, *58 Fed. Rep. 481*, a case of marine insurance; *Cadigan* v. *Brown*, *120 Mass. 493*.

The disposition of this court to uphold this kind of jurisdiction is manifested by rule 132, promulgated by Chancellor Zabriskie, who was incited thereto by feeling constrained to refuse a consolidation of several suits in equity to abate the same mill-dam. *Carlisle* v. *Cooper*, *3 C. E. Gr. 241* (not reported on that point).

Another ground of jurisdiction claimed by the complainants is that they are entitled to a discovery as to the amount paid in settlement of claims for damages to this property by the Buffalo Insurance Company and the Traders' Lloyds, there being an allegation that a settlement had been made with those persons, and that they had withdrawn from the syndicate. I do not find it necessary to express any opinion as to whether that part of the bill strengthens the jurisdiction of this court or not. I am inclined to think that it does not.

It is urged against it by the defendant that it is no affair of the complainants whether or not the underwriters in those two

policies have paid anything or not, since the liability of the complainants is confined to a certain amount against each, and if the defendant has received from those insurers more than what their share may appear to be on a final settlement between the defendant and the complainants, the complainants will not be entitled to any credit therefor. I am inclined to think that the defendant is right in this contention, but will express no opinion upon it. But if that position be true, it still, in my view, is not necessarily unimportant to the complainants to know that such payment has been actually made to this defendant., for it must he observsd that the award made by the action of all the parties hereto ascertained the total amount of damages suffered by the defendant, and that the complainants have tendered that whole sum to the defendant, and of course must, in practice, stand by that tender, and on a proper application must pay that money into court. But such payment into court will be subject to a proper reduction for the share thereof which should be paid by the two insurance companies just named if they have paid it. And it follows that the fact and amount of such payment is important, in order that it may be known whether it is or is not sufficient to cover their share of the obligation.

I will advise that the demurrer be overruled, with costs.